UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BROOKE K. WHITMAN, Individually and )
as Mother and Next Friend of SAMANTHA )
KATE WHITMAN, a minor, and JOEL )
WHITMAN, Individually )
)            Civil Action No.
)            03-CV-12543RGS
)
Plaintiffs )
)
vs. )
)
)
AUTOMATIC DATA PROCESSING, INC., )
CHANNEL ONE COMMUNICATIONS )
CORPORATION, d/b/a CHANNEL ONE )
NETWORK, and  PRIMEDIA, INC. )
)
Defendants )
)
)

### PLAINTIFF'S MOTION THAT THE COURT RECONSIDER ITS ORDER DATED SEPTEMBER 28, 2004 INSOFAR AS IT IMPOSED SANCTIONS ON PLAINTIFF'S COUNSEL

Now comes Plaintiff and moves that the Court reconsider that part of its Order dated September 28, 2004, which involved the imposition of Sanctions on Plaintiff's Counsel for alleged violations of Fed. R. Civ. P. 11(b).

As grounds, Plaintiff says as follows:

1) The Order was entered in response to an Opposition to a Motion to Amend that was filed by Plaintiff, without the Court ever giving Plaintiff, or Plaintiff's counsel, an opportunity to be heard and/or to reply to any allegations of wrongdoing in the Opposition.[1]

2) In the Order, Plaintiff's counsel was chastised for "his evident failure to properly investigate a theory of damages that he endorsed through his signature at the time the Complaint

---

[1] In fact, at the time the Court entered its Order, Plaintiff was in the process of composing a Reply, along with a Motion for Leave to file it, which would have countered those allegations.

was initially filed;" for not alleging the Plaintiff's post-partum depression sooner, or, in the words of the court, "before it was in his interest to do so;" and for not identifying Deborah Farber, R.N., as a witness, earlier than he did. In reply to these allegations, Plaintiff's counsel, Norman J. Fine, states as follows:

(a) He filed the Complaint just a few days after he received the case in his office for the first time, because the statute of limitations was running out quickly. Faced with the prospect of "blowing" the statute of limitations, or filing the Complaint without doing additional investigation into the medical causation issue, he elected to represent his client first and file the Complaint, based on the information that was then available to him.

(b) The information that was then available to him (when he filed the Complaint) was, in his opinion at the time, sufficient to enable him to do so in good faith pursuant to Rule 11. At that time, he had been advised by his co-counsel, Robert C. Anderson, Esq., that there were two (2) articles in the medical literature, which stated, *inter alia*, that a cause of pre-eclampsia was stress during pregnancy, and because of that, he reasoned that it would not be difficult to find a physician to testify to that.[2]

---

[2] At the original Scheduling Conference with the Court on March 22, 2004, there was a discussion at that time about the difficulty of locating such an expert witness, and in recognition of the importance of that, the Court - at the behest of Defendant, Channel One Communications, Inc. - shortened the time for Plaintiff to identify its expert witness(es). Implicit in that Order, at least as far as Plaintiff's counsel understood it, was that Plaintiff would make a reasonable effort to find and identify an expert witness to testify, notwithstanding that difficulty. No mention was made of any Rule 11 violation at that time.

c) He was totally unaware of any post-partum depression until just prior to the deadline for identifying expert witnesses, in July 2004. At that time, for the very first time, Plaintiff's counsel learned that Plaintiff had suffered from post-partum depression following the birth of her daughter, Samantha, and had received medical treatment for it. Plaintiff's counsel (Mr. Anderson) then immediately spoke with Deborah Farber, R.N., who had treated her during that period, and when she agreed to testify as an expert witness, she was immediately identified as such. Ms. Farber's medical records were recently obtained and will be sent to opposing counsel shortly, under separate cover.

d) He did not identify Ms. Farber as a witness earlier than he did, because, as noted above, he did not even know of Ms. Farber's existence at the time, much less that his client had suffered from, and been treated for, post-partum depression. Moreover, the early identification of witnesses after the Scheduling Conference on March 22, 2004, was for percipient witnesses only. By agreement of counsel, and as ordered by the Court, expert witnesses were to be identified later, in August. Since Ms. Farber is testifying as an expert witness, not a percipient witness, and since the Plaintiff identified her, as well as other expert witnesses, in August, the identification of her was timely and in accordance with the Court authorized deadline for doing so.

e) Attached hereto and incorporated herein by reference is the sworn Affidavit of co-counsel, Robert C. Anderson, Esq., which is submitted in support of this Motion, and which verifies and corroborates the factual statements contained in this Motion.

3) The actions of Attorney Fine in this matter were never thought by him to be in bad faith or in violation of the provisions of Rule 11(b). He also never engaged in any kind of game or ruse with opposing counsel, or with the Court, regarding pretrial discovery and/or the identification of witnesses and/or theories of recovery, and he is offended at any statement or suggestion that he was, or that he committed any "sins" (the word used by the Court) in this matter. Given that he never had the opportunity to present his side of the matter to the Court before it sanctioned him, *sua sponte*, it is submitted that the Court should reconsider its Order in light of the facts in this Motion.

### Conclusion

For the above reasons, Plaintiff moves that the Court reconsider its Order insofar as it imposed Sanctions on Plaintiff's counsel, and remove those Sanctions.

Plaintiff,
By Her Attorneys,

Dated: 10/26/04

Norman J. Fine, Esq. (BBO #165280)
Robert Anderson, Esq. (BBO #018520)
NORMAN J. FINE, P.C.
200 State Street - 3 North
Boston, MA 02109
(617) 345-0000

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **BROOKE K. WHITMAN,** ) | |
| ) | |
| Plaintiff ) | Civil Action No. |
| ) | 03-CV-12543RGS |
| vs. ) | |
| ) | |
| **AUTOMATIC DATA PROCESSING, INC.,** ) | |
| and **CHANNEL ONE** ) | |
| **COMMUNICATIONS CORPORATION,** ) | |
| d/b/a **CHANNEL ONE NETWORK,** ) | |
| ) | |
| **Defendants** ) | |

## AFFIDAVIT OF ROBERT C. ANDERSON, ESQ., IN SUPPORT OF PLAINTIFF'S MOTION THAT THE COURT RECONSIDER ITS ORDER DATED SEPTEMBER 28, 2004 INSOFAR AS IT IMPOSED SANCTIONS ON PLAINTIFF'S COUNSEL

1. I am Robert C. Anderson, and am co-counsel for the Plaintiff in this matter. I am licensed to practice law in the Commonwealth of Massachusetts, and I am a member of the Bar of this Honorable Court. I am also licensed to practice law in California, and I am a member of the Bar of that State also.

2. I am writing this Affidavit, under oath, in support of Plaintiff's Motion for the Court to reconsider its Order of September 28, 2004, insofar as it imposes Sanctions on Plaintiff's counsel for alleged violations of Fed. R. Civ. P. 11(b).

3. My law practice is currently almost entirely within the State of California and, more specifically, in the City of San Diego. I have practiced in San Diego since December, 1985.

4. My practice has for many years emphasized health care and medical issues.

5. Prior to entering the practice of law in 1980 in Massachusetts, I was employed in the health care field including, *inter alia*, as Assistant Director of the Tufts New England Medical Center Hospital and as Regional Director of the National Health Service Corps. In the latter position I was then a commissioned officer in the United States Public Health

Service. I hold a graduate degree from the Department of Epidemiology and Public Health from the School of Medicine at Yale University.[1]

6. I am the father of the Plaintiff, Brooke K. Whitman (née Anderson) [hereinafter "Brooke"].

7. When Brooke and her husband, Joel Whitman [hereinafter "Joel"], first encountered the tax problems allegedly created by the negligence of one or both defendants, they were almost immediately confronted with the IRS's levy upon their financial assets. Newly married, their financial situation was not secure as they had just purchased their first house.

8. I can verify that my daughter, Brooke, was terrified that the "government" was going to levy on their home and leave her and Joel essentially bankrupt.

9. Early negotiations with the Service were futile, and Brooke and Joel were forced to hire experienced (and expensive) tax counsel.

10. Brooke was contemporaneously pregnant with the Whitman's first child.

11. The collection efforts of the IRS continued, and Brooke began to panic. Concomitantly, her blood pressure began to rise.

12. Prior to the filing of Plaintiff's Complaint, I had performed a thorough medical literature search on the relationship, if any, between stress and pre-eclampsia. An association had, in fact, been reported in the literature. There were two major articles in the journals.

13. In the first journal article, a team of _physician researchers_ from the Department of Obstetrics and Gynecology, University Central Hospital of Helsinki, and the Research and Development Centre, the Social Insurance Institution, Helsinki, Finland reported in a paper published in the journal, _Obstetrics & Gynecology_ 2000; 95:487-490 © 2000, by the American College of Obstetricians and Gynecologists that "Depression and anxiety in early pregnancy are associated with risk for subsequent preeclampsia,...". An abstract of this article is attached as Exhibit 1 and has been widely cited and quoted since its publication.

14. The second article was a paper that had been published by a team of scientists in Brazil, and which was published in the journal, _Am J Obstet Gynecol. 2002 Mar;186(3):544-50. Stress in pregnancy: a new Wistar rat model for human preeclampsia. Takiuti NH, Kahhale S, Zugaib M._ In this article (abstract attached as Exhibit 2), the authors hypothesized that "preeclampsia is a stress-induced and an evolutionary maladaption of exaggerated stress during human pregnancy."

---

[1] Now the _School_ Of Public Health.

15. Had I not believed that there were adequate grounds upon which to base Plaintiff's allegations, both in her original Compliant, and in her First and Second Amended Complaints, I would not have represented them to Attorney Norman Fine in Boston, whom I asked to file suit for me because of impending statute of limitations issues.

16. Attorney Fine, when he filed the original Complaint, was aware of my education and experience in the health fields, both in management and in the area(s) of epidemiology. I also told him of the results of my medical literature search and of my conversations with several obstetricians. He relied on them in good faith. If any counsel is to be held responsible for any Rule 11(b) violation in this matter in equity and in fact I should and not Mr. Fine.

17. That having been said, however, the fact is that I sincerely believed at the time of the filing of the original Complaint, and at all times material thereafter right up to the present time, that the Plaintiff's allegations as to damages were true, and made totally in good faith.

18. In addition, both before suit was filed and afterwards, I also consulted with more than ten experts, both in the medical and scientific fields, including, e.g., obstetrics, psychiatry, neuroscience and psychology, with respect to the link between stress and pre-eclampsia

19. The conclusion I drew from these consultations and research was that well designed studies have demonstrated a statistically significant associational relationship between pregnancy-related stress and pre-eclampsia.

20. One nationally recognized United States physician expert in the field of pre-eclampsia with whom I discussed its etiology, Baja Sibai, M.D., a nationally recognized expert in pre-eclampsia, of the University of Cincinnati School of Medicine, commented to me that the Brazilian research team was most competent, was well respected and that their research was credible.

21. I was also informed that while the general belief is that the "cause" of pre-eclampsia is not known, this just means that the *physiological* and/or *biochemical* "causes" of pre-eclampsia are not understood. However, the basic medical sciences do not have a monopoly on researching and understanding the etiology of human disease.

    "Stress should be avoided", counsels the physician of the patient suffering from hypertension during pregnancy, but when pressed the physician cannot provide a complete "scientific," explanation as to *why* stress is universally seen as causally related to elevated blood pressure

22. The decision of Plaintiff's counsel to abandon the allegation that stress played a causative role in the development of Brooke Whitman's pre-eclampsia was **not** based on a lack of evidence, but rather on our all too many years of experience as trial attorneys which led

us to the conclusions that (1) utilizing the available pre-eclampsia experts was simply prohibitively expensive (2) a Federal civil jury was unlikely to be unanimous in finding Plaintiff's Finnish doctors, or Rio de Janeiro academic PhD's more credible than Defendants' academic physicians from Boston, and ,(3) the perceived difficulties we would have had in overcoming an anticipated Daubert challenge to our pre-eclampsia experts.

23. I also wish to comment on the statement of the Court, that Plaintiff's counsel intentionally failed to reveal allegations that the Plaintiff suffered from post-partum depression until it was "in his interest to do so." (Court's Order, page 2).

24. That statement by the Court was made without benefit of having Plaintiff's counsel comment on the Defendant's contention to that effect, and it is totally unfounded.

25. The fact is that after this case was filed, while speaking with experts as aforesaid, a Yale affiliated obstetrician informed me, sometime in July, 2004, that the relationship between stress during pregnancy and the incidence of post partum depression was significantly more widely accepted than that of stress to pre-eclampsia. A few days later I mentioned that comment to my elder daughter, Katie, who is a nationally certified Nurse Practitioner, and a faculty member of the School of Nursing at San Diego State University.

26. Katie then replied that I should know that Brooke had suffered from significant post partum depression after the birth of her daughter, Samantha, on January 15, 2001.[2] Katie also told me that Brooke and their mother had decided not to tell me of Brooke's post-partum depression because "You were three thousand miles away, would probably have worried yourself silly, and there realistically wasn't a lot you could have done to help anyway."

27. That was the very first time that I learned that Brooke had suffered from post-partum depression after the birth of her daughter, Samantha.

28. I immediately consulted Sidney Zisook,, M.D., Professor of Psychiatry in the School of Medicine of the University of California at San Diego. Dr. Zisook confirmed to me that the comments of the Yale obstetrician were credible, and he agreed to act as one of plaintiff's expert witnesses.

29. I then, for the first time, but only three-four days after I first knew of it revealed this new information to Attorney Fine, and he incorporated it shortly afterwards into the Third Amended Complaint. Neither Mr. Fine nor I intentionally concealed this information

---

[2] As an indication of the continuing, and unrelenting, intensity of Brooke's ongoing stress, while she was in-patient at New England Medical Center's high risk obstetrical unit in January 2001, and waiting for Samantha to be delivered by Caesarian section, she was very agitated and upset, and was talking to me about yet another IRS collection attempt that was happening at that very moment in time.

from the Court. Indeed, we only learned of it just before the deadline for disclosing expert witnesses.

I swear and declare under the pain and penalties of perjury, and under the laws of the Commonwealth of Massachusetts, the State of California, and the United States, that the foregoing statement of facts is all true, except as to those statements which are made upon information and belief, and as to those statements, I believe them to be true. If called on to testify as to the truthfulness of the substance of the above affidavit, I can and will so testify.

Date: 10-19-04

Robert C. Anderson, Esq.
BBO #018520
CA-State Bar No. 111033

State of California
County of San Diego

On October 19, 2004 before me, Sidneyann C. Krimple, personally appeared Robert C. Anderson, personally known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon which the person acted, executed the instrument.

WITNESS my hand and official seal.

SIDNEYANN C. KRIMPLE
Commission # 1408886
Notary Public - California
San Diego County
My Comm. Expires Apr 16, 2007

5

Obstet Gynecol. 2000 Apr;95(4):487-90.                               Related Articles, Links

## Depression and anxiety in early pregnancy and risk for preeclampsia.

**Kurki T, Hiilesmaa V, Raitasalo R, Mattila H, Ylikorkala O.**

Department of Obstetrics and Gynecology, University Central Hospital of Helsinki, Helsinki, Finland. tapio.kurki@huch.fi

OBJECTIVE: To examine whether depression and anxiety in early pregnancy are associated with preeclampsia in an unselected nulliparous population. METHODS: In this prospective population-based study during pregnancy at outpatient maternity clinics in the Helsinki metropolitan area, depression was assessed by a Finnish modification of the short form of the Beck Depression Inventory and anxiety by one established question. Preeclampsia was defined as elevated blood pressure (BP) (more than 140/100 mmHg) and proteinuria (0.3 g during 24 hours or more). Age, smoking, alcohol consumption, marital status, socioeconomic status, and bacterial vaginosis were analyzed as potentially confounding factors in a multiple logistic regression analysis. RESULTS: Six hundred twenty-three consecutive nulliparous women with singleton pregnancies were studied at ten to 17 (median 12) weeks' gestation and at delivery. Of them, 28 (4.5%) women developed preeclampsia. Depression (mean Beck score 4.5, range 3-17) was observed in 185 (30%), women and anxiety was observed in 99 (16%) in early pregnancy. In multivariate analysis, after adjustment for potentially confounding factors, depression was associated with increased risk (odds ratio [OR] 2.5; 95% confidence interval [CI] 1.1, 5.4) for preeclampsia, as was anxiety (OR 3.2; 95% CI 1.4, 7.4). Either depression or anxiety, or both, were associated with increased risk (OR 3.1; 95% CI 1.4, 6.9) for preeclampsia. Bacterial vaginosis together with depression was associated with increased risk (OR 5.3; 95% CI 1.8, 15.0) for preeclampsia. CONCLUSION: Depression and anxiety in early pregnancy are associated with risk for subsequent preeclampsia, a risk further increased by bacterial vaginosis.

Am J Obstet Gynecol. 2002 Mar;186(3):544-50.

Related Articles, Links

## Stress in pregnancy: a new Wistar rat model for human preeclampsia.

**Takiuti NH, Kahhale S, Zugaib M.**

Department of Obstetrics and Gynecology, Sao Paulo University Medical School and Laboratory of Obstetric Physiology, Brazil. nilton.takiuti@hcnet.usp.br

OBJECTIVE: Our study evaluated the effects of chronic and/or acute stress on pregnant and nonpregnant female rats. STUDY DESIGN: The rats were exposed to the sonic stimulus associated with overpopulation between days 7 and 14 of pregnancy. The rats were immobilized 2 days before the vascular reactivity experiments. RESULTS: In 14-day pregnant rats, chronic stress led to lower weight, increased adrenal weight, lower endothelium-derived relaxing factor release, and lower fetal weight. In 20-day pregnant rats, chronic stress caused decreased weight gain, higher blood pressure, increased vasomotility and proteinuria, lower endothelium-derived relaxing factor release, and lower fetal weight. In the 20-day pregnant group, the higher adrenal weight resulted in higher blood pressure, lower vascular relaxation, and lower average fetal weight. A greater number of fetuses had higher adrenal weight, higher blood pressure, and lower vascular relaxation. CONCLUSION: The alterations found in the rats were similar to those that occur in human preeclampsia. Therefore, we propose a new animal model for human preeclampsia.

Med Hypotheses. 2003 Mar;60(3):328-31.

Related Articles, Links

# Stress-related preeclampsia: an evolutionary maladaptation in exaggerated stress during pregnancy?

Takiuti NH, Kahhale S, Zugaib M.

Sao Paulo University Medical School, Brazil. nilton.takiuti@hcnet.usp.br

The authors hypothesize that preeclampsia is a stress-related disease and an evolutionary maladaptation of exaggerated stress during human pregnancy. Epidemiologic studies show that relative risk for preeclampsia is increased in many stressful situations. Many risk factors for preeclampsia are stress-related. Low-stress situations, on the contrary, are protective. Stress in pregnancy corroborates all physiopathologic theories for preeclampsia; it does not contradict them. Animals exposed to intense stress show many characteristics of preeclampsia, and some animal models for human preeclampsia have been proposed. The stress-alarm reaction is protective for survival in animals. But the evolutionary maladaptation of this intense stress could lead to preeclampsia in humans